## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| MISTY M. THOMAS, | ) | CASE NO. 1:16CV00675 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Misty M. Thomas ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her

applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for preparation of a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

### I.    PROCEDURAL HISTORY

On March 11, 2009, Plaintiff filed applications for benefits, alleging a disability onset

date of March 17, 2005 and claiming she was disabled due to an adjustment disorder, borderline

intellectual functioning, and personality disorder.  (Transcript ("Tr.") 70, 362, 369).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 210, 214, 220, 227).

A hearing was set for June 20, 2011.  While Plaintiff did not appear, the ALJ heard the arguments of counsel and the testimony of an impartial vocational expert ("VE").  (Tr. 42-64).  On October 7, 2011, the ALJ issued a written decision finding Plaintiff not disabled.  (Tr. 183).  Plaintiff timely requested review of the hearing decision.  (Tr. 539).  On May 13, 2013, the Appeals Council issued an order remanding the case for clarification of the terms "moderate" and "mild" as used in the residual functional capacity; and for proper evaluation of Plaintiff's mental health counselor. (Tr. 204-205).

On February 26, 2014, a second hearing was held before a new ALJ.  (Tr. 65).  Plaintiff, represented by counsel, and a VE testified.  (Tr. 65).  A supplemental hearing was held on June 12, 2014, during which a medical examiner and a vocational expert testified.  (Tr. 109).  On June 25, 2014, Counsel for Plaintiff submitted objections to the testimony of the medical examiner and the vocational expert.  (Tr. 547-549).  On August 26, 2014, the ALJ issued a decision denying benefits.  (Tr. 13).  The ALJ' s decision became final on January 29, 2015, when the Appeals Council declined further review.  (Tr. 1).

On March 18, 2016, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 16).  Plaintiff asserts the following assignments of error:

(1)  Whether the ALJ erred in her evaluation of the opinion of Plaintiff's treating counselor;

2

(2)  whether the testimony of a vocational expert that available jobs do not always match the limitations in the hypothetical question amounts to substantial evidence to support the decision of the ALJ and whether the hypothetical suffers from vagueness;

(3) Whether the ALJ erred under HALLEX in failing to rule on Counsel's objections to the VE's testimony.

(Doc. No. 12 at 1).

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Ms. Thomas was 20 years old on her alleged onset date, making her a younger person, under social security regulations.  (Tr. 32).  Plaintiff dropped out of school in the 11th grade. She took GED classes but did not pass the exam.  (Tr. 941).  Plaintiff has worked part-time as a stocker/porter in a grocery store, a housekeeper and laundry worker in a motel, a bell ringer for the Salvation Army, and a fast food worker.  (Tr. 456, 544).  The ALJ determined that this work did not amount to substantial gainful activity, and he accordingly concluded it was not past relevant work.  (Tr. 19, 32).

### B.  Medical Record Evidence

In 2002, while in the tenth grade, Plaintiff was referred to Thomas Zeck, Ph.D., for a child study evaluation.  (Tr. 647).  Plaintiff had exhibited difficulties with math and reading comprehension, and her teacher described her as "a fragile individual" who "has problems with common sense situations."  (*Id.*).  Dr. Zeck noted that Plaintiff responded slowly, had expressive problems, and had difficulty finding words to explain herself.  (*Id.*).  She did not always understand what was asked, and Dr. Zeck had to repeat his questions.  (*Id.*).

3

Scores on the Wechsler Adult Intelligence Scale-III (WAIS-III) showed Verbal I.Q. of 73; Performance I.Q. of 72; and a Full Scale I.Q. of 70. (Tr. 647-48). Achievement test scores showed that Plaintiff, who was seventeen years old at the time, was achieving beyond her expectancy level, but below grade level in all areas except spelling. (Tr. 648). Her scores were between fifth and eighth grade levels in reading recognition, reading comprehension, calculation problems, and applied problems. (Tr. 648-49). Dr. Zeck reported that Ms. Thomas "worked very slowly" and "[i]t took her an extraordinary amount of time to do many of the tasks." (Tr. 649).

In July 2004, Plaintiff had an appointment for services at The Nord Center. (Tr. 710). Plaintiff was alert and oriented, and her grooming was good. (*Id.*). She had good eye contact and she spoke clearly and softly. (*Id.*). The interviewer noted Plaintiff occasionally asked to repeat questions, was often slow to respond to questions, appeared confused at times, but was future oriented. (*Id.*).

In November 2004, a WAIS-III test of Plaintiff showed Verbal I.Q. of 73; Performance I.Q. of 75; and Full Scale I.Q. of 72. (Tr. 527). Achievement tests showed that Plaintiff was performing higher than expected given her ability. (Tr. 534). Her age equivalency scores for basic reading skills, reading comprehension, written expression, and oral expression ranged from six years, eight months to thirteen years, six months. (Tr. 527, 534). The evaluator noted that Plaintiff required a great deal of time to complete tasks for the evaluation, had difficulty expressing herself verbally and in writing, and had difficulty assessing common sense situations. (Tr. 534). Additionally, the evaluator noted she had difficulty maintaining employment due to her inability to work at an adequate pace. (*Id.*).

4

In April 2009, Plaintiff presented at the Nord Center seeking treatment for depression. (Tr. 758). Plaintiff complained that she sleeps a lot, has difficulty getting things done, and has a hard time comprehending things. (*Id.*). A mental status examination revealed logical thought process, euthymic mood, full affect, anhedonia, memory impairment, and estimated borderline intelligence. (Tr. 768). The counselor diagnosed depressive disorder not otherwise specified (by history), with a GAF[1] score of 62. (Tr. 767). On May 6, 2009, Plaintiff met with the same counselor to develop a treatment plan. (Tr. 708).

On May 21, 2009, Plaintiff met with counselor Pamela Vegeh, MSW-S, who reviewed Ms. Thomas's treatment plan. (Tr. 831).

On June 23, 2009, Plaintiff presented to Nancy Danielson, APRN, CNS, for a psychiatric evaluation. (Tr. 770). Plaintiff exhibited an exaggerated startle response, hypervigilance, and tangential and circumstantial speech. (Tr. 772). Ms. Danielson reported that "it was evident that she had some type of learning disability but difficult to pin down. [sic] A lot of it seemed to be around understanding concepts that weren't easily simplified." (*Id.*). Plaintiff demonstrated great difficulty understanding some of the questions. (*Id.*). Ms. Danielson diagnosed depressive disorder NOS, by history, and posttraumatic stress disorder, with a GAF score of 55. (*Id.*). Ms.

---

[1]The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

Danielson prescribed Cymbalta, an anti-depressant, recommended counseling, and noted I.Q. testing could be beneficial.  (Tr. 773).

From July 2009 to April 2010, Plaintiff had a number of counseling sessions with Ms. Vegeh and with Ms. Danielson.  (Tr. 820-28).  During that time, it was noted that Plaintiff was anxious and insecure and was functioning well below capability.  (Tr. 826, 828).  Cymbalta was discontinued due to side effects.  (Tr. 827). It was also reported that Plaintiff was anxious, insecure, angry, confused, and frustrated.  (Tr. 820-25).

In August 2013, Plaintiff presented to Maria Davidson, MSW, LSW, complaining of depression and anxiety.  (Tr. 832).  She was diagnosed with major depressive disorder, recurrent, moderate, and anxiety disorder NOS, with a GAF score of 45.  (Tr. 838-839).  She was referred to Far West Center for on-going mental health services.  (Tr. 838).

In September 2013, Plaintiff presented to a social worker at Far West Center, who completed a mental health assessment update.  (Tr. 860, 862).  After an evaluation, Plaintiff was prescribed antidepressants and an anti-anxiety medication.  (Tr. 859).  Plaintiff had additional counseling sessions between September and November 2013, and it was noted that Plaintiff had difficulty understanding the roles of the workers at the Far West Center.  (Tr. 855).  In November 2013, a nurse treating Plaintiff for pain after a blood clot noted that she presented as highly anxious and tearful.  (Tr. 929).

Between December 2013 and February 2014, Plaintiff was seen at MetroHealth for a mental health assessment, two counseling sessions, and one appointment with a social worker.  (Tr. 924, 940-45, 962-64, 987-90).  The counselor diagnosed depression, anxiety, and rule-out posttraumatic stress disorder.  (Tr. 945).  Plaintiff was assigned a GAF score of 51-60 for

moderate symptoms. (*Id.*). Plaintiff reported that she took GED classes but failed the test. (Tr. 941). The counselor noted that Ms. Thomas's speech was difficult to understand; her cognition, judgment and insight were questionable; her mood was depressed, anxious, and frustrated; and her self-esteem was very poor. (Tr. 941, 944, 963, 987-88). The social worker noted that Ms. Thomas was aware of what is going on and how to contact agencies and people for assistance, but "[i]t is apparent that there are some mental disabilities." (Tr. 990). In January 2014, Plaintiff's pain management doctor noted that she appeared to have a cognitive/learning deficit that made effective communication difficult. (Tr. 976).

**C. Opinion Evidence**

**1. Richard N. Davis, M.A.**

In May 2006, psychologist Richard N. Davis, M.A., evaluated Plaintiff at the request of the state agency. (Tr. 665-673). Plaintiff stated she had back pain but she was not seeing a doctor at that time and she took no medications. (Tr. 668).

On mental status examination, Mr. Davis noted Plaintiff presented with average to good appearance; was limited intellectually; had satisfactory flow of conversation and thought; had difficulty sleeping; sometimes had crying spells; had average energy; presented with no preoccupations, obsessions, excessive religiosity, delusions, or hallucinations; had difficulty understanding some questions but could be easily made to understand; could not perform serial sevens; and had limitations in her ability to think logically. (Tr. 669-70).

No significant work-related limitations were reported. (Tr. 672). Mr. Davis indicated that Plaintiff did not have problems with fellow workers and supervisors in her last employment, was able to understand and follow directions well enough to remain employed for two and a half

7

years as a cashier in a department store, and performed more than simple, repetitive tasks as a cashier. (Tr. 672, 668). Mr. Davis stated that Plaintiff seemed to be dealing with the stresses and pressures in her life, although they were "minimal" at that time since she was not employed and "doesn't do much around the place." (Tr. 672). He also noted that Plaintiff said her only stress and pressure was not being able to find employment (Tr. 672).

Mr. Davis diagnosed adjustment disorder with occasional depression and borderline intellectual functioning, and he assessed a GAF score of 60 representing moderate symptoms. (Tr. 671).

### 2. Leslie Rudy

In May 2006, Leslie Rudy, a state agency psychologist, reviewed the record evidence. (Tr. 674-691). Dr. Rudy stated that Plaintiff could perform simple routine work tasks, but may have mild difficulties with more complex tasks. (Tr. 676). Dr. Rudy concluded that Plaintiff would not have difficulty relating to others in a workplace environment; and she could maintain attention adequately. (Tr. 676).

### 3. Pamela Vegeh

In August 2009, Pamela Vegeh, a mental health counselor, assessed Plaintiff. (Tr. 774-75). Ms. Vegeh described Plaintiff's ability to function in certain work-related activities as "poor to none." (Tr. 774-75). These activities included relating to co-workers, using work judgment, functioning independently, maintaining attention and concentration, behaving in an emotionally stable manner, relating predictably to social situations, and persisting in work activity. (Tr. 774-75). "Poor to none" was defined as "no useful ability to function in this area." (Tr. 774). She had a "fair" ability to follow work rules; interact with supervisors; deal with the public;

8

understand, remember, or carry out simple job instructions; maintain personal appearance; and demonstrate reliability.  (Tr. 774-75).  Ms. Vegeh diagnosed depressive mood disorder, rule-out posttraumatic stress disorder (PTSD), and assessed a GAF score of 55.  (Tr. 775).

### 4. Ronald Smith, Ph.D.

In October 2009, Ronald Smith, Ph.D., evaluated Plaintiff at the request of the state agency.  (Tr. 725-734).  He reported that Ms. Thomas was late to the appointment: "When she finally got to the area of the office, she wandered around the parking lot on her cell phone to the examiner who was trying to give her directions….She seemed rather helpless and unable to follow his directions." (Tr. 726).

On mental status examination, Dr. Smith noted that Plaintiff seemed naïve, her thinking scattered and indecisive, her speech "mushy and rapid" and not always articulate, and her cognitive abilities limited.  (Tr. 734).  Plaintiff was cooperative and she exhibited appropriate affective expression with a good range of affect.  (Tr. 729).  She had a good mood and denied crying spells and anxiety.  (*Id.*).  She had no abnormal mental content but had poor insight and fair judgment.  (*Id.*).  Plaintiff was alert, in good contact with reality, and oriented.  (*Id.*).  Plaintiff reported watching television, playing video games, doing dishes, cleaning her room, and going shopping with her boyfriend.  (Tr. 730).  Plaintiff stated that she did not cook except for microwaving food and that her boyfriend helped her with tasks.  (*Id.*).

Dr. Smith assessed borderline intellectual functioning and personality disorder NOS and assessed a GAF score of 55 (moderate symptoms).  (Tr. 730-31).  Dr. Smith opined that Plaintiff was mildly impaired in her ability to relate to others and understand, remember and follow instructions; and moderately impaired in her ability to maintain attention, concentration and

persistence in routine tasks and in her ability to withstand the stress and pressure of day-to-day work activity.  (Tr. 731).  He noted that others may perceive Ms. Thomas as overly demanding or expecting a lot of help.  (*Id.*).  Additionally, he indicated that she may be viewed as expecting excessive help from others, working slowly, and not understanding why her hours are cut.  (*Id.*).  In response to Social Security's voucher on the possibility of malingering or embellishment of symptoms, Dr. Smith reported, "there was no particular reason to view her presentation as being malingering."  (Tr. 732).

### 5. Roy Shapiro, Ph.D.

In October 2009, Roy Shapiro, Ph.D., a state agency psychologist, reviewed the record evidence.  (Tr. 735-52).  Dr. Shapiro opined that Plaintiff had moderate limitations in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  (Tr. 749).  Dr. Shapiro concluded that Plaintiff had moderate limitation in responding appropriately to changes in the work setting, and in setting realistic goals or making plans independently of others.  (Tr. 736).  Dr. Shapiro opined that Plaintiff was capable of simple, repetitive tasks in a work environment without strict time or quota demands where changes could be explained and superficial short-term interactions with others.  (Tr. 737).

### 6. Caroline Lewin, Ph.D.

In April 2010, Caroline Lewin, Ph.D., a state agency psychologist, reviewed the record. (Tr. 754).  Dr. Lewin concurred with Dr. Shapiro's opinion.  (*Id.*).

D.       **Hearing Testimony**

During the February 2014 hearing, Plaintiff testified to the following:

- She had lived with a friend on and off for eleven years, but she did little around the house. She did no laundry and she did not cook. She did not do any grocery shopping. Plaintiff testified that while her room mate is at work, Plaintiff watches television. (Tr. 82). Plaintiff had never lived on her own, and she did not drive because she could not pass the test. (Tr. 79-81, 94).

- Plaintiff went as far as the eleventh grade, and she was in special education classes. Her grades were Cs, Ds, and Fs. (Tr. 84-86).

- Plaintiff last worked at McDonald's for a few months in 2012. (Tr. 88). She performed light cleaning in the kitchen and the restrooms. (Tr. 89). Plaintiff operated the cash register for about one day. (*Id.*).

- In 2010 and 2011, she worked part time at a Ramada Hotel cleaning rooms, but she was reassigned to laundry duties because she was too slow. (Tr. 89-90).

- Plaintiff worked for a few months at Marc's grocery store stocking produce, but, because she was too slow, she was assigned to cleaning the restroom. (Tr. 91-92).

- Plaintiff asserted that every boss she has had told her that she needed extra reminders to complete her work. (Tr. 94).

The ALJ presented the following hypothetical worker to the vocational expert:

I'd like you to consider a person with the same age, education, and past work as a claimant who is able to occasionally lift 20 pounds, and frequently lift 10 pounds. Is able to stand and walk six hours of an eight hour work day. Is able to sit for six hours of an eight hour work day. Would have unlimited push and pull, other than shown for lift, and or carry. In addition, this hypothetical individual can perform simple, routine, repetitive tasks consistent with unskilled work with no fast pace or high production quotas, and where changes in the work can be easily explained. And this hypothetical individual can have superficial interaction with others. And by superficial, I mean of a short duration for a specific purpose. Given such a hypothetical individual, first off, would this hypothetical individual be able to perform that past work that you identified either as -- either as generally or actually performed?

(Tr. 144). In response, the VE testified that the hypothetical worker could perform unskilled jobs

such as assembler of small products, assembler of electrical accessories, and inspector and hand

11

packager. (Tr. 145). The ALJ then added the limitation that the hypothetical worker would be only capable of low stress work, meaning no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility. (Tr. 146). The VE testified that this individual would be able to perform the jobs already identified.

The ALJ added another limitation    that the worker would be off task approximately 20 percent of the time due to symptoms of depression and anxiety. (*Id.*). The VE testified that such an individual would not be competitive in any unskilled occupation. (*Id.*).

The ALJ then removed the 20% off task limitation and added the limitation that the worker would need to be reminded of tasks on a daily basis. (*Id.*). The VE testified that if the worker needed repeated reminders (more than once an hour), a job coach would be needed, which would be considered an accommodation. (Tr. 147).

Plaintiff's counsel cross-examined the VE with respect to the "no fast pace" limitation contained in the primary hypothetical. The VE testified that in assessing whether a job had "no fast pace," he looked to whether the job had the so-called "S temperament." (Tr. 152-153). The VE testified that "S Temperment" occupations make up 2.1% of jobs in the economy. (Tr. 152). He agreed with counsel these are jobs that are extremely stressful, such as dynamite handler, airline pilot, police officer, and the medical professions. (*Id.*). The VE agreed that by using the "S temperment" as his criterion, he "just ruled out ones that are extremely [stressful]." (*Id.*). The VE conceded that there might be times when a fast pace is required to perform certain jobs without the "S" temperament, such as jobs on a production line. (Tr. 153). However, the VE testified that the jobs he considered in this case were "pretty much static jobs." (Tr. 150).

12

The VE defined "changes that can be easily explained" to men that "there's no real complex training that needs to happen." (Tr. 156). However, the ALJ seemed to concede that all unskilled work has changes that are easily explained. (*Id.*).

Counsel also questioned the VE about the limitation that the worker be limited to "short" interactions with the supervisor. (Tr. 157). The VE testified that the occupations he identified require "short" interactions with the supervisor, but he noted that the same jobs might require more protracted interactions with supervisors during the training period. (157-158).

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).

Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).

Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on her alleged disability onset date, March 17, 2005 and remained insured through December 31, 2014.  (Tr. 19).  Therefore, in order to be entitled to

14

POD and DIB, Plaintiff must establish a continuous twelve month period of disability

commencing between these dates.  Any discontinuity in the twelve month period precludes an

entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v.*

*Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   The claimant has not engaged in substantial gainful activity since March 17, 2005, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: back pain, body aches, complex regional pain syndrome, migraines, affective disorder (depressive disorder, not otherwise specified by history/adjustment disorder with occasional depression), anxiety disorder (anxiety state/posttraumatic stress disorder), personality disorder, and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), further limited to the performance of simple routine repetitive tasks (unskilled work) with no fast pace or high production quotas; where changes can be explained; with superficial interaction (meaning of a short duration for a specific purpose) with others; and limited to the performance of low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on February 23, 1985 and was 20 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

15

8.  The claimant has at least a high school education[2] and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 17, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-33).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

---

[2]    The ALJ's conclusion that Plaintiff had at least a high school education appears to be contradicted by other evidence in the record. The parties do not explain this apparent discrepancy.

16

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

      Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

      In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Whether the ALJ erred in her evaluation of the opinion of Plaintiff's treating counselor**

Plaintiff points out that after the denial of her claims in 2011, the Appeals Council remanded her claim for proper consideration of the opinion of Pamela Vegeh.  (Doc. No. 12 at 15).  The Appeals Council indicated that even though Ms. Vegeh was not an acceptable medical source, "all medical opinions, regardless of the source, must be evaluated and weighed."  (Tr. 205, citing 20 C.F.R. §§ 404.1527(c), 416.9279(c) and SSR 06-3p).  Plaintiff maintains that the ALJ failed to properly evaluate Ms. Vegeh's opinion on remand.

In Ms. Vegeh's opinion, Plaintiff's ability to function in certain work-related activities was "poor to none."  (Tr. 774-75).  Those activities included relating to co-workers, using work judgment, functioning independently, maintaining attention and concentration, behaving in an emotionally stable manner, relating predictably to social situations, and persisting in work

18

activity.  (Tr. 774-75).  "Poor to none" was defined as "no useful ability to function in this area."

(Tr. 774).  Ms. Vegeh opined Plaintiff had a "fair" ability to follow work rules; interact with

supervisors; deal with the public; understand, remember, or carry out simple job instructions;

maintain personal appearance; and demonstrate reliability.  (Tr. 774-75).  Ms. Vegeh diagnosed

depressive mood disorder, rule-out posttraumatic stress disorder (PTSD), and assessed a GAF

score of 55.  (Tr. 775).

> The ALJ discussed Ms. Vegeh's opinion as follows:
>
> Pamela [Vegeh], MSW-S, not an acceptable medical source, on August 4, 2009
> suggested that the claimant had poor or no ability to behave in an emotionally stable
> manner, relate predictably to social situations, or persist in work activity (Exhibit
> 18F/19, August 4, 2009).  These extreme limitations are not supplied by the record as a
> whole which documents a greater level of functioning and an ability to get along with
> others.  There are no records from 2011 to 2012.  The claimant appeared to be doing
> well off all of her medications. She was reassessed again on August 12, 2013 after a
> long gap.

(Tr. 30).  Plaintiff asserts that this analysis is inadequate because the ALJ only discusses three of

the limitations identified by Ms. Vegeh.  Because the ALJ is required to consider the record as a

whole, *Hurst v. Comm'r*, 753 F.2d 517, 519 (6th Cir. 1985), Plaintiff maintains, the ALJ should

have considered each and every limitation identified by Ms. Vegeh.  In addition Plaintiff

contends that the ALJ further erred because she provided no citation to the record to support her

assertions.

First, while an ALJ must consider the record as a whole, she is "not required to analyze

the relevance of each piece of evidence individually." *Bailey v. Comm'r of Soc. Sec.*, 413

F.App'x 853, 855 (6th Cir. 2011).  Rather, "the decision must contain only 'the findings of facts

and the reasons for the decision.'" *Id.* (quoting  20 C.F.R. § 404.953).  Here, the ALJ

appropriately described her reasons in a manner consistent with the applicable law. A mental

health counselor, such as Ms. Vegeh, is an "other source" pursuant to 20 C.F.R. § § 404.1513(d)

and 416.913(d), and her opinion is not subject to the "good reasons" requirement of the treating

physician rule. *See Sisky v Colvin*, 2016 WL 4418104 at * 8 (N.D. Ohio Aug. 19, 2016); *Pyotsia

v. Astrue*, 2013 WL 101932 at *6 (N.D. Ohio Jan. 8, 2013). However, according to Social

Security Ruling ("SSR") No. 06 03p, 2006 WL 2329939 (Aug. 9, 2006), an ALJ must still

consider opinions and findings from "other sources." The regulations provide guidance as to

how opinions from "other sources" should be considered and weighed:

> Since there is a requirement to consider all relevant evidence in an individual's case
> record, the case record should reflect the consideration of opinions from medical
> sources who are not "acceptable medical sources" and from "non-medical sources" who
> have seen the claimant in their professional capacity. Although there is a distinction
> between what an adjudicator must consider and what the adjudicator must explain in
> the disability determination or decision, the adjudicator generally should explain the
> weight given to opinions from these "other sources," or otherwise ensure that the
> discussion of the evidence in the determination or decision allows a claimant or
> subsequent reviewer to follow the adjudicator's reasoning, when such opinions may
> have an effect on the outcome of the case. In addition, when an adjudicator determines
> that an opinion from such a source is entitled to greater weight than a medical opinion
> from a treating source, the adjudicator must explain the reasons in the notice of decision
> in hearing cases and in the notice of determination (that is, in the personalized disability
> notice) at the initial and reconsideration levels, if the determination is less than fully
> favorable.

SSR 06-03P.

Here, consistent with the regulations and the case law, it is sufficiently clear why the

ALJ assigned the weight she did to Ms. Vegeh's opinion. Contrary to Plaintiff's position, the

ALJ's opinion is adequately supported with citations to record evidence. The ALJ points out

that the record as a whole documents a greater level of functioning and a greater ability to

interact with others than that to which Ms. Vegeh opined. (Tr. 30). For example, the ALJ

discussed evidence of Plaintiff's everyday activities, noting that she used a computer; kept in contact with family using social media; lived with a male friend; had a boyfriend; was able to tie her hair in a French braid; rode the bus; took care of her personal needs; engaged in various hobbies, including writing, art, crocheting, watching television, and playing video games; and was taking GED classes. (Tr. 30).

The ALJ also noted plaintiff was doing well without medication, citing evidence showing that as of December 11, 2009, Plaintiff was not exhibiting depressive or anxiety symptoms and that medication was not recommended at that time.  (Tr. 823).  On July 29, 2009, Plaintiff reported doing "pretty good right now" even though she was not on medication.

Further, the ALJ addressed in great detail various medical opinions which described Plaintiff's impairments as less severe than Ms. Vegeh opined.  (Tr. 27-29).  The ALJ considered and assigned some weight to the opinion of psychologist Richard Davis, who reported no significant work limitations.  (Doc. 28, 665-673).  Mr. Davis's notes indicate that Plaintiff's greatest source of stress was not being able to find employment.  (Tr. 672).  The ALJ also considered the opinion of Dr. Smith, who opined that Plaintiff was mildly impaired in her ability to relate to others and understand, remember and follow instructions; and moderately impaired in her ability to maintain attention, concentration, and persistence and in her ability to withstand the stress and pressure of day-to-day work activity.  (Tr. 29, 731).  The ALJ also considered the opinion of Roy Shapiro, Ph.D., who opined that Plaintiff was capable of simple, repetitive tasks in a work environment without strict time or quota demands and where changes could be explained, and with superficial short term interactions with other.  (Tr. 27, 735-752).

Based on the above, the ALJ's reasons for discounting Ms. Vegeh's opinion were adequately explained, and the above-cited evidence substantially supports the ALJ's decision to discount Ms. Vegeh's opinion.

**B.  Second Assignment of Error: Whether the ALJ erred by relying on the testimony of the Vocational Expert.**

At the fifth step of the sequential process, the burden shifts to the Commissioner. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997) (citing 20 C.F.R. § 404.1520). The Commissioner's burden at the fifth step is to prove the availability of jobs in the national economy that the claimant is capable of performing. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 92 (6th Cir.1999).  To meet this burden, there must be "a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *O'Banner v. Secretary of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir.1978).  "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical question,' but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments.'"  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.1984)); 20 C.F.R. § 404.1566(e).

**1. Whether the jobs identified by the VE meet the description of the hypothetical**

Plaintiff maintains that the ALJ erred by relying on the VE's testimony, because the jobs identified by the VE did not meet the description of the hypothetical question at all times.  It should be noted that this argument does not amount to a direct attack the VE's choice of jobs. That is to say, counsel does not argue that an assembler of small products, by definition, is

subject to fewer or different, less severe limitations than the hypothetical worker described in the RFC, nor does counsel assert that the limitations described in the RFC are not fairly represented by the assembler of small productions occupation, as that occupation is defined in the Dictionary of Occupational Titles.  Rather, Plaintiff's challenge is a challenge to the methodology by which the VE accounted for the "no fast pace" limitation when he selected jobs that Plaintiff was capable of performing.

During the hearing, the ALJ posed a hypothetical to the VE that included "no fast pace" and "no high production quota" limitations.  The VE testified that three job types existed in the national economy that Plaintiff could perform that included these limitations: assembler of small products, assembler of electrical accessories, and inspector and hand packager.  The VE's method for accommodating the "no fast pace" limitation, was to exclude jobs that require an "S" temperament.  The VE testified that an "S" temperament job is one that is extremely stressful, such as dynamite handler, airline pilot, and medical professional.  (Tr. 151-52).  Further, the VE defined "no high production quotas" to mean that the hypothetical worker could be off task for up to 15% of the time.

Plaintiff points out that on cross-examination the VE agreed that eliminating "S" temperament jobs does not necessarily eliminate all "fast pace" jobs.  That is, even jobs without the "S" temperament, may, at times, require a fast pace.  Thus, Plaintiff maintains that because the VE's methodology did not fully eliminate all fast pace jobs, a remand is required in order to clarify the vocational expert testimony.  This argument has no merit.  While the VE conceded there are jobs absent the "S" temperament that still have a fast pace, he explained that the jobs

that do are production line jobs.  The VE testified that jobs he had identified were "pretty much static jobs."  (Tr. 150).

Plaintiff also points to VE testimony that a fast pace might be required even in the three jobs he identified, if the hypothetical worker were off-task more than 15% of the time.  (Tr. 153). As stated by the VE,

> if you're exceeding the 15 percent they're building in, then you're going to have to work faster at some time in order to even that pace out.  So I suppose they would have to work faster at times if they're not keeping up to    with production rates as they're going along.

(Tr. 153).  Plaintiff contends that based on this testimony, the jobs identified by the VE (assembler of small products, etc.), would at times require a fast pace.  As such, Plaintiff contends a remand is required to clarify the VE's testimony.

This argument has no merit.  Based on the VE's testimony, it is apparent that a fast pace may be required, but only in those instances when a worker is off-task more than 15% of the time.  In this case, Plaintiff's RFC included a limitation of "no high production quotas."  The VE testified that an individual limited to "no high production quota" will be off-task no more than 15% of the time.  Thus, based on the RFC (which Plaintiff does not directly challenge), Plaintiff would not be off task more than 15% of the time.  Accordingly, the identified jobs (which account for Plaintiff's "no high production quota" limitation) adequately reflect Plaintiff's RFC.

During cross examination, Plaintiff's counsel imagined a possibility where certain employers might ask for a rush job, so that an employee might be required to work at a fast pace to complete an order by noon.  Because the VE testified that such a scenario might be possible, Plaintiff maintains that the jobs identified by the VE do not accurately represent Plaintiff's

24

limitations.  The Court disagrees.  Just because the VE acknowledged counsel's speculations

during cross examination does not mean that the identified jobs do not match the hypothetical or

Plaintiff's RFC.  The VE testified that the jobs he identified were selected with consideration for

both the "no fast pace" and the "no high production quota" limitations.  The VE's testimony

requires no clarification on this point.

### 2. Vagueness and the failure to account for moderate difficulties with concentration, persistence, or pace.

Next, Plaintiff takes issue with the limitation that "changes can be easily explained."

On cross-examination, the VE testified that this limitation meant that there is "no real complex

training that needs to happen."  (Tr. 156).  Plaintiff suggests that the limitation suffers from

vagueness, since, as the VE testified, it is true with all unskilled work that there is "no real

complex training that needs to happen."  And given this purported vagueness, Plaintiff maintains

that the "changes can be easily explained" limitation fails to account for Plaintiff's moderate

limitations with concentration, persistence, or pace.

This argument is unpersuasive.  The ALJ adequately accounted for Plaintiff's moderate

limitations with concentration, persistence, or pace by limiting her to simple, routine, repetitive

tasks; no fast pace or high production quotas; superficial interaction with others (meaning of a

short duration for a specific purpose); and low stress work meaning no arbitration, negotiation,

responsibility for the safety of others or supervisory responsibility (R. 26, 144-46).  *See*

*Dultmeyer v. Comm'r of Soc. Sec.*, 2014 WL 991900 at * 18 (N.D. Ohio March 13, 2014) ("The

RFC limits [the claimant] to simple, routine work which adequately addresses the issue of

concentration"); *Kline v. Comm'r of Soc. Sec.*, 2013 WL 1947164 at * 5 (N.D. Ohio April 17,

2013) (explaining that the claimant's limitations in concentration and persistence were satisfied when the RFC limited her to "simple, routine, repetitive, one or two step tasks"); *Foreman v. Colvin*, 2013 WL 3200615 at * 13 (N.D. Ohio June 24, 2013) (finding the hypothetical question accounted for [the claimant's] moderate limitations in concentration, persistence, and pace by limiting her to 'simple and routine tasks, but not in a fast-paced production environment.").

In sum, Plaintiff's second assignment of error has no merit.

**C.      Third Assignment of Error: Whether the ALJ erred under HALLEX in failing to rule on Counsel's objections to the VE's testimony**

Plaintiff maintains that the ALJ erred by failing to rule on counsel's objection to the VE's testimony in violation of Section I-2-5-55 of HALLEX, which is a rulebook for administrative law judges and the Appeals Council.  Plaintiff claims that HALLEX I-2-5-55 requires the ALJ to "rule on the objection and discuss any ruling in the decision."  However, review of the rule cited by Plaintiff reveals so such requirement.  HALLEX I-2-5-55 states: "When an administrative law judge (ALJ) obtains a vocational expert (VE) opinion during a hearing, the ALJ will generally explain why the VE is present before his or her opening statement."  The rule does not support Plaintiff's argument, and Plaintiff cites no other rule or law that would require the ALJ to explicitly resolve counsel's objection.

In any event, Plaintiff's objection had no merit.  Plaintiff argued that the VE's testimony as to the number of "assembler of electrical accessory" jobs available in the national economy was unreliable, because the VE's number was inconsistent with the Occupational Employment Statistics ("OES").  Assuming Plaintiff is correct and there is an inconsistency, counsel provides no support for the idea that the VE was bound by the OES.  Moreover, counsel

fails to acknowledge that when presenting his testimony, the VE also relied on the Dictionary of Occupational Titles and its companion publication Selected Characteristics of Occupations, among other sources.  (Tr. 146-48).  Even if the VE's testimony on the number of "assembler of electrical accessory" jobs was inaccurate, the VE also found that two other jobs (assembler of small products and inspector and hand packager) existed in significant numbers in the economy. Plaintiff fails to meaningfully challenge the VE's testimony with respect to those occupations.

In sum, Plaintiff's third assignment of error should be overruled.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


 */s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 12, 2016

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**